STROUGH v. CENTRAL R. CO. OF NEW JERSEY.

(Circuit Court of Appeals, Third Circuit. December 2, 1913.)

No. 1,667.

1. NEGLIGENCE (§ 32*)—"WANTON"—"WILLFUL."

The words "wanton" and "willful," as applied to negligence toward a licensee, do not necessarily imply any purposeful design of defendant to injure plaintiff, or in fact to injure any one, but are applicable to every species of willful conduct which is reckless of the dangers that may ensue therefrom.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 42–44; Dec. Dig. § 32.*

For other definitions, see Words and Phrases, vol. 8, pp. 7384, 7385, 7468–7481, 7835, 7836.]

2. RAILROADS (§§ 275, 282*) — ACCIDENTS TO TRAINS — LICENSEES — WANTON AND WILLFUL NEGLIGENCE.

Defendant's main track from B. to the New Jersey terminal was also used by the trains of the R. Company governed by defendant's rules, one of which provided that when a train was backed against the current of traffic the engineer should blow his whistle three times and await a reply before starting, and that a flagman should take a position on the front of the leading car and signal the engineman in case of need. One of defendant's trains having stopped on the main track to remove some cars, a freight train of the R. Company, of which decedent was brakeman, approached from the rear and stopped 150 feet from defendant's train. Decedent and certain of his coemployés on the R. train went forward in accordance with a custom and boarded the caboose of defendant's train for drinking water, and while there defendant's engineer returned his engine against the standing cars with such force that the train was forced back against the R. Company's engine, the caboose wrecked, and decedent caught and killed before he could escape. It also appeared that the air brakes were not working and that no whistle was blown before defendant's train was forced back, nor was any brakeman stationed on the caboose to signal the engineer as required by the rule. Held, that decedent was not a trespasser, but a licensee, and that the facts were sufficient to create an inference of wanton and willful negligence on the part of defendant's engineer for which it would be liable.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 873–877, 910–923; Dec. Dig. §§ 275, 282.*]

In Error to the District Court of the United States for the District of New Jersey; Joseph Cross, District Judge.

Action by Sarah Ann Strough, as administratrix of the estate of Edwin William Strough, deceased, against the Central Railroad Company of New Jersey. Judgment for defendant, and plaintiff brings error. Reversed.

Wilson & Carr, John O. Wilson, and Harvey F. Carr, all of Camden, N. J., for plaintiff in error.

George Holmes, William D. Edwards, and Charles E. Miller, all of Jersey City, N. J., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. Action was brought in the court below by the plaintiff, as administratrix of her deceased husband, Edwin William

Strough, to recover damages for his death alleged to have been caused by the negligence of the defendant company. It was tried before a jury in the court below, and at the close of plaintiff's case, defendant's counsel moved for a non-suit, which was granted. The plaintiff excepted to this rule, and sued out a writ of error. The only question before the court is as to the correctness of the rule granting the non-suit.

At the time of the happening of the accident for which this suit was brought, and for a number of years prior thereto, the Reading Railway Company had, under an agreement with the defendant company, operated its trains over the tracks of the latter, the Central Railroad Company of New Jersey, from Bound Brook, in New Jersey, to Jersey City. This use was conjoint with that of the defendant company itself, and was governed by the rules of that company, although the trains of the Reading Company were moved under the control and management of its own servants.

Strough, plaintiff's intestate, was a brakeman in the employ of the Reading Railway Company. On September 29, 1910, the day of the accident, he was employed on an extra freight train running from Bridgeport, Pennsylvania, to Jersey City, New Jersey. When the Reading Company's train reached Elizabethport, New Jersey, at about three o'clock in the morning, on the tracks of the Central Company, it was brought to a stop about 150 feet from the rear of a Central Company freight train standing ahead of it on the same track. There was no definite testimony as to the number of cars in the Central Company train, but it was estimated that there were 40 or 45.

After the Reading Company train had come to a stop, three employés of that train, to wit, the conductor, fireman and decedent, went forward and entered the caboose in the rear of the Central Company train. It was testified that they entered the caboose—or at least some of them did—for the purpose of getting a drink of water, which they were not able to easily procure on their own train. It was shown that such a visit, far from being an unusual occurrence, was a common practice indulged in as a mutual convenience by the train crews of both companies. The flagman of the Central Company's train was in the caboose with these men. While these four men were in the caboose, the engineer of the Central Company's train was engaged in moving out cars from the middle thereof. When he had finished, he backed his engine and such cars as were still coupled to it, to recouple to the cars that had remained stationary. This he did with such force that his train was driven over the interval of 150 feet which separated it from the train of the Reading Company, and the caboose, in which were the four men above mentioned, was driven up against the Reading engine so violently that two men, one of them the decedent, were caught and held fast in the wreckage. So securely was the caboose wedged upon the engine, that a shifting engine was required to remove it and release the men. When this was finally done, the plaintiff's husband was found to be dead.

The plaintiff offered in evidence certain rules of the Central Railroad Company, prescribing precautions to be taken by its employés when a train was backed against the current of traffic. These rules

required, among other things, that the engineer blow his whistle three times and await a reply before starting, and that "a flagman must take a conspicuous position on the front of the leading car and signal the engineman in case of need." The rules also require that air brakes be coupled and in operation. It is true, that the existence of the rules above referred to tends to show such care and foresight on the part of the defendant company, in the operation of its trains, and, as far as they go, such performance of its duty in that regard, as would absolve it from a moral or personal responsibility for the accident. The negligence charged is not as to a default of the defendant in this respect. The defendant company is responsible, not only for the existence and enforcement of proper rules regulating the operation of its trains, but also in certain cases for the defaults of its servants in relation thereto, so that the personal equation, in the practical operation of the great transporation business of such a carrier company, enters into the question of responsibility, and the unforeseen or unexpected default or negligence of a servant, who has been selected with due care, may impose upon that company a liability which its management could not have avoided. No question of the negligence of a fellow servant is here involved. The negligence of the engineer is imputable to the defendant, which was his employer, and the question to be determined here is, whether such negligence, if proved, was of such a character as would be a violation of any duty owed by the defendant to the plaintiff.

Upon the trial, there was evidence tending to show that no whistle warnings were sounded at all, and that no brakeman was posted upon the platform of the foremost car (which in this instance was the caboose) of the backing portion of the train. It was also shown that when the men in the caboose found themselves moving toward the Reading engine, they endeavored to apply the air brakes, but found them out of working order. Upon this state of the case, the defendant moved for a non-suit, and the court allowed it, on the ground that there was no evidence of any duty of care on the part of the defendant toward the plaintiff, assuming all the evidence offered by plaintiff to be true, nor of any actionable negligence on its part.

Among the general propositions stated by the defendant in error is the following:

"Except at stations and yards and at highway crossings, a railroad company is entitled to the exclusive use of its track and property; all persons who go thereon are trespassers, and no recovery can be had for an injury to such class of wrongdoers, unless there is a wanton injury, after discovery of the presence of a trespasser."

This proposition, however, is beside the question with which we are here concerned. The plaintiff was not a trespasser, in any view that can be taken of the facts disclosed in the record. A higher degree of care and a stricter duty was owing from the defendant to the plaintiff under the circumstances, than was owing to a mere trespasser. Whether the general rule, as above stated, be qualified, or not, as to a trespasser, it must be so qualified as to one not a trespasser, that if the defendant is guilty of such willful and wanton negligence as evidences a reckless disregard of the dangers naturally

ensuing therefrom, it is liable for the injury thus caused to such person, although his presence had not been discovered. It is important, therefore, to consider the relation existing between the train employés of the Reading Company and the defendant company and its employés, while the two companies were using in common the tracks of the latter.

For a distance of some twenty miles between Bound Brook and Jersey City, the two companies conjointly operated their trains on the tracks of the Central Company. It is obvious that this conjoint operation could not have been efficiently or even safely carried on without constant and intimate friendly intercourse between the servants of the two companies, and especially between the crews of their freight and passenger trains. We may take judicial notice that each company was carrying on a large traffic, which must have rendered contact and intercourse between the two sets of operating servants more frequent than would have been the case in a less congested occupation of the tracks. There was evidence tending to show that such intercourse between the crews of freight trains of the two companies, when standing still near each other from any cause, was usual, and we can conceive of circumstances under which it might be necessary. The antecedent probability that such intercourse would constantly occur, tends to strengthen the evidence as to the existence of the custom. There is no evidence that such usage or custom was discountenanced by either company, and it is impossible under the evidence to assume that it was not known to the directing and operating officers of both companies.

From all this, it clearly appears that the relation of the decedent and other employés of the Reading Company to the defendant company, in such a situation as is here established, was that of licensees. It may be conceded that as such licensee, the plaintiff "must take the conditions as he finds them, and there is no obligation to respond in damages if he is injured by the inherently dangerous nature of the place." This is the well settled law applicable to a mere licensee who is injured upon the premises upon which he is licensed to go. He takes the risk of the inherent or patent and obvious dangers of the premises, but he does not take the risk of such wanton and willful negligence of the licensor as shows a reckless disregard of the safety of the licensee; that is, he does not take the risk of a danger not inherent in the premises, or one that is not open and obvious, but caused by gross or reckless negligence of the licensor supervening the license. As said by the learned counsel for the plaintiff in error:

"When the presence of persons on the premises is reasonably to be expected, a disregard of all precautions for their safety is clearly wanton and willful negligence, within the meaning of those words."

[1] It is not necessary to discuss the numerous well considered cases cited by the plaintiff in error, in which the meaning of the word "wanton" and "willful" is applied to the negligence of which a licensee complains. The later authorities all agree that those words do not necessarily imply any purposeful design of the defendant to injure plaintiff, or in fact to injure any one. They are applicable to all willful conduct which is reckless of the dangers that may ensue therefrom.

[2] In considering whether the evidence tended to show negligence of the engineer of the defendant company, of a kind and degree as would impose a liability upon the company to this plaintiff, we again refer to the rules of the defendant company applicable to a situation where a train was backed against the current of traffic. In such cases, the engineer must blow his whistle three times and await a reply before starting; that "a flagman must take a conspicuous position on the front of the leading car and signal the engineman in case of need, and air brakes must be coupled and in operation."

These rules are sufficient to warn, if such warning were necessary, the engineer and others of the crew of a long freight train, that backing the same against the current of traffic was a hazardous undertaking, and that the rules prescribing the precautions to be taken must be strictly observed. We have before pointed out that the precautions enjoined by these rules were all disregarded, and their disregard tended to aggravate the negligence charged against defendant. The testimony tending to show such disregard by the engineer of the defendant company was that of the fireman and engineer of the Reading train. Some of this testimony was unquestioned, but, whether contradicted or not, it was clearly sufficient to require its submission to the jury.

In addition to the evidence as to the disregard of the precautions prescribed by the rules of the defendant company, there is also testimony as to the extraordinary character of the impact or impacts given to the defendant company's train by the engineer, whose only duty in backing up was to make a coupling with the cars remaining stationary on the defendant's track. Taking cars out of his train, placing them upon other tracks, and backing on again, must have afforded the engineer opportunity to observe that the Reading train was not far behind; but, however this may be, it must be conceded that what occurred, was extraordinary. The fireman of the Reading Company's train testified as follows:

"A. Yes, sir. We stopped about a hundred and fifty feet behind the Central Railroad freight, and I fixed my fire. After I fixed my fire I got off the engine and I went up to the Central Railroad caboose to get a drink of water. I drawed a cup of water and just had it about drunk when we got a bump, but not thinking very seriously over it, because we thought he was coupling, when we got another bump and we all made a break for the door. The flagman of the Central Railroad was the first one off and he turned on the angle cock of the air hose and there was no air there—

"(Objected to.)

"Q. How do you know that?

"A. I was on the platform. The flagman jumped to the ground, and Mr. Faust jumped to the ground, and I jumped from the caboose to our engine. The caboose had already climbed the pilot of our engine, and before I knowed it, as I jumped for the running board, I was caught between our engine and their caboose, the headlight of the engine.

"Q. Was that how you lost your arm?

"A. Yes, sir.

"Q. Who was in the caboose?

"A. The flagman of the Central, Conductor Faust, of the Philadelphia & Reading, Brakeman Strough and myself.

"Q. They were all Reading men except the flagman?

"A. Yes, sir.

"Q. What happened to Mr. Strough?

"A. He was killed."

This testimony was repeated and emphasized on further examination, direct and cross, and confirmed by the testimony of the engineer of the Reading train. From the facts established by this testimony, uncontradicted or unexplained by the defendant, it seems clear, at least, that an inference could be drawn by reasonable men that the conduct of the engineer, from which these deplorable and extraordinary consequences ensued, was characterized by a reckless disregard of what might happen to those exposed to the dangers of the situation. What happened, was not to be expected of an engine backing to couple to a long heavy freight train standing stationary on the track. To have driven such a train over the intervening 150 feet onto the pilot of the Reading engine must have required a very unusual impact and force. No ordinary operation of the engine could have so overcome the inertia of the heavy train, as to not only drive it against the Reading engine, but to force it up upon the pilot of the same and cause it to "turn turtle."

We think this evidence clearly tended to raise the question, whether the conduct of the engineer evidenced a reckless disregard of the safety and rights of others; that is, whether wanton and willful negligence was not inferable from the evidence. This was a question for the jury and not for the court.

It is not necessary to speculate how the jury would or should have answered this question. They might have answered it one way or the other, and if the case had gone on, the defendant might have been able to so explain the conduct of the engineer as would give to it a different aspect. Our only concern here is, to determine whether, under the circumstances, the case should have been taken from the jury at the conclusion of the plaintiff's evidence. As we think it should not, the judgment of the court below is reversed, with an order for a venire de novo.